UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: JUN 1 0 2015

Angel Vasquez,

                        Plaintiff,

            —v—

New York City Department of Education and Paula
Cunningham,

                        Defendants.

11-CV-3674 (AJN)

MEMORANDUM &
ORDER

ALISON J. NATHAN, District Judge:

        Following a two-day jury trial on Plaintiff Angel Vasquez's single claim for gender

discrimination under the Equal Protection Clause of the Fourteenth Amendment, a jury awarded

Mr. Vasquez $2,700 in compensatory damages and $20,000 in punitive damages.  The

Defendants, the New York City Department of Education and Paula Cunningham, then filed a

post-trial motion pursuant to Federal Rules of Civil Procedure 50 and 59 seeking judgment as a

matter of law or, alternatively, a new trial.  Following review of the trial record and the

arguments advanced in the parties' briefs, the Court finds no basis to disturb the jury's verdict.

Therefore, and as discussed in greater detail below, Defendants' motion is DENIED.

## I.    BACKGROUND

        Plaintiff Angel Vasquez initially filed this action in New York State Supreme Court for

New York County, asserting that Defendants discriminated against him based on his race and

gender in violation of the New York State Human Rights Law ("NYSHRL"), New York City

Human Rights Law ("NYCHRL"), and the Equal Protection Clause of the Fourteenth

Amendment.  Defendants then removed the action to this Court and later moved for summary

judgment.  In a Memorandum & Order dated March 5, 2014, the Court granted the motion in

substantial part, leaving only one claim for trial: Plaintiff's claim for gender discrimination based

on Principal Cunningham's decision not to reappoint him to an after-school basketball program.

1

Dkt. No. 32 at 36. The Court also denied summary judgment as to Defendants' qualified immunity defense and argument that Plaintiff cannot show municipal liability with respect to the remaining claim. Dkt. No. 32 at 36-37. The Court assumes familiarity with this material.

The following testimony was presented at a two-day jury trial held in December 2014. Mr. Vasquez testified that he began working for the New York City Department of Education in September 2007 as a sixth grade teacher at P.S. 117 in Queens, New York. Tr. 41:1-17. Principal Harvey Katz headed P.S. 117 from the time Mr. Vasquez was hired through the end of the 2008-2009 school year. Tr. 41:25-42:10. At some point in September 2008, Maya Gutierrez-Granados, the co-president of the school's Parent-Teacher Association, approached Mr. Vasquez to discuss starting a new physical fitness program at the school. Tr. 42:14-43:7. The two then prepared and submitted to Principal Katz a proposal for an after-school program that would include calisthenics, stretching, and basketball, which Principal Katz later approved. Tr. 43:13-45:7. The after-school program started in November 2008 and ran until late May or early June 2009. Tr. 45:8-11, 46:8-10. Mr. Vasquez led the program from its inception, but halfway through the first year, another teacher, Mr. Raymond Miley, joined him in running the program. Tr. 45:23-13. Mr. Vasquez received compensation for his involvement with this after-school program, known as "per-session activity," Tr. 64:17-19, in the amount of $135 per week, Tr. 48:18-49:3. Beyond such monetary compensation, Mr. Vasquez testified that he "loved" running the program during the first year: "It was something that I always wanted to bring to the school. You know, it was something that I felt like I was a part of. I helped create it." Tr. 49:4-8.

At the end of the 2008-2009 school year, Principal Katz retired and was replaced by Principal Paula Cunningham. Tr. 49:14-18. Prior to restarting the after-school program in the 2009-2010 school year, Principal Cunningham informed the teachers at the school that they would need to submit a letter of interest if they wanted to participate in the program. Tr. 51:13-15. Sometime after submitting a note to Principal Cunningham indicating his desire to participate in the program, Mr. Vasquez was called to have a meeting with her. Tr. 51:4-11,

51:22-25. Mr. Vasquez testified that, during this meeting, Principal Cunningham told him "she wouldn't be allowing [him] to participate because she wanted a female teacher to run the program." Tr. 52:4-7. Mr. Vasquez "felt really surprised and devastated" by the news, stating: "I didn't know why it was being taken away from me for some reason. Besides what Ms. Cunningham stated of her wanting a female teacher to run it, I didn't think it was fair and I just felt really sad, just really depressed." Tr. 55:4-10. Only two other teachers, Mr. Miley and Ms. Kerry Sullivan, expressed an interest in the program and they were ultimately chosen to lead it. Tr. 59:1-7, 83:4-8.

When Principal Cunningham took the stand, she testified that she "selected the two senior staff members who had more seniority over [Mr.] Vasquez to coach the basketball program." Tr. 83:6-7. Principal Cunningham later elaborated that she took into consideration the letters of interest that the three teachers had submitted as well as number of years of experience within the school building. Tr. 86:11-16. When pressed as to what factors, aside from seniority, she had considered, Principal Cunningham stated:

> A. I considered individuals who had the ability to be able to watch a large group of students, engage a large group of students in physical activity.
>
> Q. So that was one factor that you considered. And you believed that Ms. Sullivan would be able to do that?
>
> A. Yes.
>
> Q. Why did you think that?
>
> A. She's a certified teacher with the Department of Education.
>
> Q. So any teacher, you felt, would have been qualified to assume this position?
>
> A. Any teacher that met the minimum requirements in terms of submitting me a letter of intent and meeting the requirements that were stated in the letter of intent and considering their number of years of experience as a Department of Education teacher within the school building, those are all factors that I had to consider in determining whether or not they would be appointed to the position.

Tr. 87:2-18. (Principal Cunningham earlier testified that she had not asked Ms. Sullivan if she had any background in running a fitness program or playing basketball. Tr. 79:17-25.)

On cross-examination, Principal Cunningham stated on at least three separate occasions that "seniority is *a* factor" in awarding per-session activity positions. Tr. 95:19-23, 96:22 (emphasis added). She further stated that she could not recall the meeting that Mr. Vasquez described in his testimony, Tr. 98:1-4, but that it was "absolutely not" true that that "the reason why [she] did not appoint [Mr. Vasquez] to the program was because [she] wanted a woman to run the program," Tr. 97:14-19. When questioned on re-direct examination about what she meant by "seniority is a factor," Principal Cunningham stated that "[i]f all candidates are equally qualified, the individuals who have the most seniority will be hired and appointed for the position." Tr. 100:14-17. And when asked if she "would agree that two candidates can meet the minimum qualifications for the posting, yet one candidate could be more qualified for that position," she responded: "A candidate could have additional or more experience in a particular area." Tr. 101:23-102:3. During this same exchange with Plaintiff's counsel, he asked: "And my question is, if the candidate did not have equal qualification, seniority wouldn't necessarily trump, correct?" Tr. 101:4-5. She replied: "I imagine so." Tr. 101:6. On re-cross examination, she stated "[s]eniority *is considered* in this posting, as stated in the posting. And the two individuals, three individuals applied for the posting, and two individuals had seniority, more seniority than the probationary teacher, Mr. Angel Vasquez." Tr. 103:20-24 (emphasis added). (Although Principal Cunningham referred to a "posting" in her testimony, no exhibits were admitted at trial and neither Principal Cunningham nor Ruth Bowman, Mr. Vasquez's union representative and the only other witness who testified, could recall if a posting for this position had been made or what it said, only that such postings were usually created for such positions.)

Ms. Bowman, testifying as part of the Defendants' case, stated that when multiple teachers apply for a per-session activity with limited openings "you look at the qualifications. If they meet the qualifications then you go to school seniority. So if someone applied for an art position and it said must have some kind of background in art and 12 people applied and only one person had that background, regardless of seniority that person would get it." Tr. 123:2-7.

Following deliberations, the jury returned a verdict in favor of the Plaintiff, awarding him $2,700 in compensatory damages and $20,000 in punitive damages.

## II.    DISCUSSION

In light of the different legal standards applicable under Rule 50 and Rule 59, the Court discusses arguments under each rule separately.  As revealed in the discussion that follows, Defendants' arguments for judgment as a matter of law or, alternatively, a new trial—to the extent not waived or abandoned—lack merit.

### A.    Rule 50

A court may grant a motion for judgment as a matter of law (or "JMOL") pursuant to Federal Rule of Civil Procedure 50 only if "the evidence, viewed in the light most favorable to the nonmoving party, is insufficient to permit a reasonable juror to find in his favor." *Arlio v. Lively*, 474 F.3d 46, 51 (2d Cir. 2007) (citing *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir. 1988)).  Stated differently, a court "will not set aside a judgment unless (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [it]." *Advance Pharm., Inc. v. United States*, 391 F.3d 377, 390 (2d Cir. 2004) (quoting *Galdieri-Ambrosini*, 136 F.3d at 289) (internal quotation marks omitted).  "In deciding such a motion, the court must give deference to all credibility determinations and reasonable inferences of the jury, and it may not itself weigh the credibility of witnesses or consider the weight of the evidence." *Galdieri-Ambrosini*, 136 F.3d at 289 (citations omitted).

As a procedural matter, a party must move for judgment as a matter of law pursuant to Rule 50(a) prior to the submission of the case to the jury, and, in making the motion, the party must "specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment." *Id.* at 286 (quoting Fed. R. Civ. P. 50(a)(2)) (internal quotation marks omitted).  District courts generally reserve judgment and submit the case to the jury so that, in

the event the court of appeals reverses the judgment as a matter of law, the "need for a second trial will be avoided." *Id.* at 282.  Pursuant to Rule 50(b), a party may renew its motion following an unfavorable verdict, but the "'[p]ost trial motion is limited to those grounds that were specifically raised in the prior motion for [JMOL].'" *Id.* at 286 (quoting *McCardle v. Haddad*, 131 F.3d 43, 51 (2d Cir. 1997)).  "[T]he purpose of requiring the moving party to articulate the ground on which JMOL is sought 'is to give the other party an opportunity to cure the defects in proof that might otherwise preclude him from taking the case to the jury.'" *Id.* (quoting *Baskin v. Hawley*, 807 F.2d 1120, 1134 (2d Cir. 1986)).  "Accordingly, the JMOL motion must at least identify the specific element that the defendant contends is insufficiently supported," but the court must also "view the motion in the context of the ensuing colloquy between counsel and the trial court, and if that colloquy fleshes out the motion, it may provide the opposing party with the requisite notice." *Id.* at 286-87 (citations omitted).  "If specificity was lacking JMOL may neither be granted by the district court nor upheld on appeal unless that result is 'required to prevent manifest injustice.'" *Id.* at 287 (quoting *Cruz v. Local Union No. 3*, 34 F.3d 1148, 1155 (2d Cir. 1994)).

### 1.    Gender Discrimination

Defendants first argue that Plaintiff failed to present sufficient evidence to establish even a *prima facie* case of gender discrimination under the Equal Protection Clause.[1]  To establish a *prima facie* case for gender discrimination under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), a plaintiff must show: "(1) she is a member of a protected class; (2) her job performance was satisfactory; (3) she suffered adverse employment action; and (4) the action occurred under circumstances giving rise to an inference of discrimination." *Raspardo v. Carlone*, 770 F.3d 97, 125 (2d Cir. 2014) (quoting *Demoret v. Zegarelli*, 451 F.3d 140, 151 (2d Cir. 2006)) (internal quotation marks omitted).  If "the plaintiff

---

[1] Defendants' opening brief also advances arguments under the NYSHRL and NYCHRL, but the Court granted summary judgment for Defendants on Plaintiff's NYSHRL and NYCHRL claims. Dkt. No. 32 at 17 n.9. Consistent with this determination, the Joint Pretrial Report stated that the only claim left to be tried was Plaintiff's Equal Protection claim. Dkt. No. 38 at 2.  Thus, it is unclear why the Defendants present arguments in their post-trial motion on these grounds.

6

makes such a showing, the burden shifts to the defendant employer to provide a legitimate, non-discriminatory reason for the action. If the defendant is able to make such a showing, 'the burden shifts back to the plaintiff to prove discrimination, for example, by showing that the employer's proffered reason is pretextual.'" *Id.* Defendants do not dispute that Mr. Vasquez was a member of a protected class, performed his job in the after-school basketball program satisfactorily, and was not re-appointed to the position in the 2009-2010 school year. Instead, they argue that there was insufficient evidence for a jury to find that the action occurred under circumstances giving rise to an inference of discrimination. The Court disagrees.

First, Ms. Sullivan, a female, replaced Mr. Vasquez in the second year of the program, a fact that is generally understood to support an inference of discrimination. *Gladwin v. Pozzi*, 403 F. App'x 603, 606 (2d Cir. 2010) (citing *Zimmerman v. Assocs. First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001)). Defendants argue that the fact that Mr. Miley, "a man[,] was also appointed to the program suggests gender was not a factor in the decision." Defs.' Br. 8 (citing *Samuels v. N.Y. State Dep't of Corr. Servs.*, No. 94 Civ. 8645 (SAS), 1997 U.S. Dist. LEXIS 6739, at *18-19 (S.D.N.Y. May 14, 1997)). But it is undisputed that Mr. Miley held the same position in each year of the program; the only change was that a female replaced Mr. Vasquez, the program's creator and arguable leader.

Second, Mr. Vasquez testified that Principal Cunningham told him that the reason he was not being re-appointed to the position was because she wanted a woman in that role. Defendants argue that this "self-serving testimony" should not be credited. But Principal Cunningham's testimony that she could "not recall" whether she had a meeting with Mr. Vasquez at which she informed him that she wanted a woman to take his place was equally self-serving, and a rational jury could conclude that it was less convincing than a more straightforward denial of ever having made such a statement. And although Mr. Vasquez testified that Ms. Bowman attended this meeting, "at the back of the room," Tr. 61:12, Ms. Bowman could not recall attending the meeting, nor could she recall every meeting she attended with a teacher, Tr. 135:8-10. Similarly, Defendants argue that Mr. Vasquez's self-serving testimony is undermined by the fact that the

7

two selected teachers had tenure while Mr. Vasquez did not.  But Principal Cunningham presented inconsistent statements as to whether seniority was the determinative factor in deciding who would get the position or merely one factor among others.  Moreover, Defendants failed to produce any documentary evidence, such as school policies, showing that per-session activity positions must be awarded based on seniority alone.  With only the testimony of the three witnesses available on this point, it was for the jury to decide whose testimony to credit.

To be sure, the evidence in the case consisted solely of trial testimony from three witnesses and boiled down to a contest of "he said, she said."  But in such situations, "the court must give deference to all credibility determinations and reasonable inferences of the jury, and it may not itself weigh the credibility of witnesses or consider the weight of the evidence." *Galdieri-Ambrosini*, 136 F.3d at 289 (citations omitted).  Therefore, because there is no serious dispute that Mr. Vasquez was replaced by a woman and because a jury could have credited Mr. Vasquez's testimony over Principal Cunningham's, the Court concludes that there was sufficient evidence for Mr. Vasquez to satisfy his *prima facie* case of gender discrimination.

## 2.   Mixed Motives

Alternatively, Defendants argue that they should not be liable because Principal Cunningham had no choice in making her decision.  The Defendants advance this argument under the "mixed-motive" framework, which allows a defendant to avoid liability even in the face of direct evidence of discrimination if she "prove[s] by a preponderance of the evidence that [she] would have made the same decision even" in the absence of the discriminatory motive. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 257 (1989).

The problem with Defendants' mixed-motive argument is that it is an affirmative defense, *Price Waterhouse*, 490 U.S. at 246, and, even though either party can request an instruction on this defense, *Ostrowski v. Atl. Mut. Ins. Cos.*, 968 F.2d 171, 180-84 (2d Cir. 1992), a mixed-motive instruction is not given *unless* it is requested, *cf. Rose v. N.Y. City Bd. of Educ.*, 257 F.3d 156, 163 (2d Cir. 2001) ("Thus, where a plaintiff provides sufficiently direct evidence of discriminatory animus and also challenges all of defendants proffered motives as pretextual, a

8

jury must be instructed, *if requested*, to apply the *Price Waterhouse* burden-shifting analysis if it finds the employer was motivated by discriminatory animus but is not fully persuaded by the plaintiff's claims of pretext." (emphasis added)); *see also Fields v. N.Y. State Office of Mental Retardation & Developmental Disabilities*, No. 96-7523, 1997 U.S. App. LEXIS 19794, at *24-25 (2d Cir. May 23, 1997) ("Although in most cases this instruction should not be given unless the defendant itself requests it, we have ruled . . . that in some narrowly defined circumstances, the plaintiff can 'impose' on a reluctant defendant an affirmative defense instruction supported by the evidence.").

Despite being fully aware of *Price Waterhouse* and the mixed-motive defense, the Defendants did not request a mixed-motive instruction in this case. Rather, the only instruction requested on this point concerned pretext under the *McDonnell Douglas* burden-shifting framework. *See* Dkt. No. 44; Tr. 186:13-24. Indeed, at the charging conference, Defendants confusingly requested adding a section to the verdict form regarding the *Price Waterhouse* mixed-motive defense, but they explicitly disavowed a request to add a corresponding instruction to the jury charge. Tr. 146:22-148:25. This led the Court to point out that it would be inconsistent to add a mixed-motive question to the verdict form without a comparable jury instruction. Tr. 147:18-19 ("So you want all of that in the verdict form but not in the jury instructions?"). In light of the confusion, the Court asked for written submissions from the parties on the evening of the first day of trial regarding how they would like to change the verdict form. Tr. 148:20-24. Given the timing, Defendants also could have requested a change to the jury instructions. The Defendants' submission, however, simply stated that the "Defendants have no further comments concerning the proposed Verdict Form at this time." Dkt. No. 58. In sum, Defendants neither requested an instruction on this defense nor objected to the charge as given.

In their post-trial motion, Defendants do not explicitly contend that a mixed-motive instruction should have been given in this case—likely because they recognize that such an argument is waived due to their failure to request the charge prior to submitting the case to the

jury. Fed. R. Civ. P. 51.[2]  Instead, they argue that the Court should find as a matter of law that

the Defendants are not liable because, they contend, the evidence supports their affirmative

defense.  They also suggest that their failure to request the charge somehow lies at the feet of

Plaintiff: "Had plaintiff even attempted to impeach the testimony of either Ms. Cunningham or

Ms. Bowman on that point—which plaintiff did not do—defendants were prepared and could

have offered additional evidence.  It is not defendants' burden to prove their innocence." Defs.'

Br. 11.  As discussed below, Plaintiff *did* impeach Principal Cunningham's testimony on this

point.  Regardless, it was for the Defendants to request an instruction on this defense if they

wanted to assert it, and their failure to request this instruction bars them from invoking it in their

post-trial motion.  *Conti v. Corp. Servs. Grp., Inc.*, 30 F. Supp. 3d 1051, 1074 (W.D. Wash.

2014); *see also Hallinan v. Rep. Bank & Trust. Co.*, 519 F. Supp. 2d 340, 349-351 (S.D.N.Y.

2007) (rejecting a defendant's attempt to invoke a defense in a post-trial motion where the

defendant failed to request a jury instruction on the defense or object to the instructions as

given).

     Thus, the only possible relief for the Defendants at this stage is pursuant to Rule 51(d),

which provides that "[a] court may consider a plain error in the instructions that has not been

preserved as required by Rule 51(d)(1) if the error affects substantial rights."  Fed. R. Civ. P.

51(d)(2); *see also Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 153 (2d Cir. 2010) ("Because

Henry failed to object to the inclusion of the *McDonnell Douglas* framework, we review its

inclusion for plain error." (citing *Shah v. Pan Am. World Servs., Inc.*, 148 F.3d 84, 96 (2d Cir.

1998)).  The Second Circuit has "long noted that the plain error exception to Rule 51's objection

requirement 'should only be invoked with extreme caution in the civil context.'"  *Rasanen v.*

*Doe*, 723 F.3d 325, 333 (2d Cir. 2013) (quoting *Pescatore v. Pan Am. World Airways, Inc.*, 97

F.3d 1, 18 (2d Cir. 1996)).

---

[2] In their reply brief, Defendants argue that Plaintiff waived any objection to their mixed-motive argument. Reply Br. 1 n.1. To the contrary, Plaintiff explicitly addressed Defendants' argument in the context of pretext, Opp'n Br. 7-11, which, as noted in the text, was the way in which the case was presented to the jury. Thus, Plaintiff did not waive this argument.

In considering the possibility of plain error here, the Court finds instructive Judge Jones's opinion in *Conti*, which involved a similar failure to request an instruction on a mixed-motive defense under a comparable state antidiscrimination law:

> First, the court doubts that it can ever be error to fail to instruct a jury as to an affirmative defense that a defendant did not request. Because no defendant is obligated to pursue an affirmative defense, a court need not instruct a jury on an affirmative defense merely because the evidence might support it. Indeed, to instruct a jury on an affirmative defense that a defendant has not invoked would likely be an error that prejudices the plaintiff. Second, even assuming that it was error, it was not plain. No party raised the possibility of [the mixed-motive] defense . . . . Third, even if there was plain error, the court doubts that it prejudiced Defendants, because the court doubts that Defendants could have risen above the clear and convincing evidence barrier that [state law] erects.

30 F. Supp. 3d at 1074. The absence of plain error is more striking on the facts here because the Defendants danced around the possibility of the *Price Waterhouse* mixed-motive defense both days of trial and then appeared to make a strategic decision not to request it, even when given the opportunity to do so following the charging conference. Under prevailing Second Circuit case law, it was not for the Court to second-guess this seemingly calculated decision:

> [T]he Price Waterhouse issue does not arise for the trier of fact until the plaintiff has carried the burden of persuading the trier that the forbidden animus was a motivating factor in the employment decision but has failed to persuade the trier that non-discriminatory reasons proffered by the employer were pretexts and not also motivating factors. Once the presentation of evidence is sufficient to create this possibility, the employer has the *option* of defending on the Price Waterhouse ground that it would have made the same decision even in the absence of a discriminatory motive. Price Waterhouse is thus a defense. However, for tactical reasons, it is often only the plaintiff who asks for a Price Waterhouse instruction, for when requests to charge are submitted, *the employer may well choose to avoid the burden-shifting language in the Price Waterhouse charge*, hoping that the jury either will not find a forbidden animus or will believe the burden is on the plaintiff in the case of a mixed motive.

*Ostrowski*, 968 F.2d at 181 (emphasis added). For this reason alone, the Court concludes that Defendants should be held to their decision not to request an instruction on an affirmative defense that they were clearly aware of.

Moreover, as in *Conti*, the Court doubts that Defendants were prejudiced—i.e., that the error affects their substantial rights—because the evidence does not clearly establish a mixed-

motive defense. To begin with, and contrary to Defendants' stated excuse for failing to put on the defense, Plaintiff did impeach Ms. Cunningham and Ms. Bowman's testimony on the issue of seniority. As noted, Ms. Cunningham offered inconsistent statements as to whether seniority was *the* determinative factor or merely *a* factor in making per-session activity appointments. On re-direct, she affirmatively answered Plaintiff's counsel's question that "if the candidates did not have equal qualification, seniority wouldn't necessarily trump, correct?" Tr. 101:4-6. She also stated that the only qualification for the position was that the applicant be a teacher in good standing at the school and then later indicated that she considered whether the applicant would be able to manage a large group of students. She further stated that she never inquired as to Ms. Sullivan's background in running after-school recreational programs, much less any prior experience with basketball, the primary focus of the program. And Ms. Bowman testified that qualifications generally were taken into account, suggesting that someone with no background in the position would not get the position regardless of his or her seniority. Thus, contrary to the Defendants' arguments, neither Principal Cunningham nor Ms. Bowman definitively testified that Principal Cunningham had no choice but to appoint Ms. Sullivan over Mr. Vasquez based solely on Ms. Sullivan's seniority.

In short, the Court will not set aside the jury's verdict based on an affirmative defense that was not included in the jury's instructions, particularly where the Defendants were aware of the defense and by all appearances made a conscious decision not to request the instruction. Rather, in light of the instruction given and the evidence presented at trial, the proper inquiry in this Rule 50 motion is whether there was sufficient evidence from which a reasonable jury could conclude that Defendants' proffered legitimate justifications were pretextual. For the reasons discussed above, particularly Principal Cunningham's inconsistent and less-than-clear statements on the issue of seniority, the Court concludes that there was. *Cf. Bagley v. J.P. Morgan Chase & Co.*, No. 10 Civ. 1592, 2012 U.S. Dist. LEXIS 97045, at *36 (S.D.N.Y. July 12, 2012) ("'A plaintiff may show pretext by illuminating such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered reasons that would raise doubt in the

factfinder's mind that the employer did not act for those reasons.'" (quoting *Clarke v. Pacifica Found.*, No. 07 Civ. 4605(FB), 2011 U.S. Dist. LEXIS 105468, at *28 (E.D.N.Y. Sept. 16, 2011))).

### 3.    Punitive Damages

Defendants next argue that there was insufficient evidence to support a finding of punitive damages.  Punitive damages are available in gender discrimination cases if "an employer discriminates or retaliates against an employee with 'malice' or 'reckless indifference' to the employee's federally protected rights.'" *Carrion v. Agfa Constr.*, 720 F.3d 382, 386 (2d Cir. 2013) (citing *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 572 (2d Cir. 2011)).  "'A plaintiff can satisfy this burden by presenting evidence that the employer discriminated (or retaliated) against him with conscious knowledge it was violating the law, or that it engaged in egregious or outrageous conduct from which an inference of malice or reckless indifference could be drawn.'" *Id.* at 387 (quoting *Tepperwien*, 663 F.3d at 573).  "These standards are virtually identical: they require, for an award of punitive damages, that a defendant not only intentionally discriminate but do so in the face of a perceived risk that these actions are prohibited by law." *Greenbaum v. Svenska Handelsbanken*, 67 F. Supp. 2d 228, 262 (S.D.N.Y. 1999) (Sotomayor, J.).

Prior to addressing the merits of this argument, the Court notes at the outset that it was likely waived because it was not made with specificity following the close of Plaintiff's case. Before Plaintiff rested, defense counsel alluded to a Rule 50 motion on the issue of punitive damages: "We're stuck in this area where the plaintiff technically hasn't rested yet, so I think defendants still have an opportunity to make a Rule 50.  I don't think that tomorrow's witness is going to testify about evidence sufficient to support a reckless indifference charge, but I would make that motion on a Rule 50." Tr. 143:3-8.  The next day, Plaintiff's anticipated witness failed to show, which led Plaintiff to rest his case, followed immediately by Defendants' Rule 50 motion.  Tr. 161:23-162:8.  The motion primarily contended that "there is no evidence to suggest that gender animus played any role in Mr. Vasquez's inability to get that position," i.e., that he

13

failed to make out a *prima facie* case. Tr. 162:9-163:10. When the Court asked if Defendants

had anything else, defense counsel stated: "Your Honor, other than the fact that under

*Pricewaterhouse* the decision not to appoint Mr. Vasquez would still have been made to appoint

. . . Ms. Sullivan, that is the only additional argument that we have." Tr. 163:12-20. Then, after

the Court gave the jury its instructions, but prior to releasing the jury to deliberate, the following

exchange took place:

| | |
|---|---|
| The Court: | Any errors in anything that I read or objections, final objections? |
| Mr. Stodola: | Just the same thing we raised yesterday, which was the instruction on punitive damages. But I didn't discuss it yesterday. |
| The Court: | Well, you didn't – I said are you going to make a Rule 50 motion, which you didn't. |
| Mr. Stodola: | I did make a Rule 50 motion. |
| The Court: | Not on punitive damages. |
| Mr. Stodola: | I raised an objection on that yesterday. |
| The Court: | On the instruction, and I said, are you going to make a Rule 50 motion. You said, it's difficult because everything is not in and because there is one more witness. |
| Mr. Stodola: | Well, the defense objects to the instruction about it. |

Tr. 193:17-194:7. As the transcript reflects, Defendants failed to make a Rule 50 motion on the

issue of punitive damages even though they hinted on the first day of trial that they might move

on this basis. And the objection to the jury instruction following the reading of the full charge to

the jury, assuming it could be construed as a Rule 50 motion, was too late to afford "the other

party an opportunity to cure the defects in proof that might otherwise preclude him from taking

the case to the jury." *Galdieri-Ambrosini*, 136 F.3d at 286. Thus, because Defendants failed to

make a proper Rule 50(a) motion on punitive damages, they are barred from making a Rule

50(b) motion on this basis.

Even if not waived, Defendants Rule 50(b) motion on punitive damages lacks merit.

Although there was no "smoking gun" demonstrating Principal Cunningham's reckless disregard

of the law, "much of the evidence used to support a finding of intent is also probative of reckless

disregard of a plaintiff's rights. This is especially so where, as here, the illicit activity is an

14

unexceptional and paradigmatic type of discrimination, one that is commonly recognized as prohibited." *Greenbaum*, 67 F. Supp. 2d at 262-63 (citations omitted).  Principal Cunningham testified that she was an assistant principal from 2004 until her promotion to principal in 2009. Tr. 71:11-16.  Mr. Vasquez testified that Principal Cunningham told him "she wouldn't be allowing [him] to participate because she wanted a female teacher to run the program."  Tr. 52:6-7.  When Principal Cunningham's attorney asked her if Mr. Vasquez's testimony was true, she stated: "It is not true, absolutely not."  Tr. 97:19.  Based on this testimony, a jury could have inferred that a longtime school administrator would be aware that it was impermissible to discriminate on the basis of gender, that Principal Cunningham's response to her attorney's question demonstrated that she knew it was impermissible, and that, if Mr. Vasquez's testimony were credited, she nonetheless chose to discriminate against him on the basis of gender.  Thus, crediting all inferences in favor of Mr. Vasquez, there was sufficient evidence for a jury to find that Principal Cunningham intentionally discriminated "in the face of a perceived risk that these actions are prohibited by law."  *Greenbaum*, 67 F. Supp. 2d at 262.  It is not for the Court to second-guess this determination.

Defendants also point to the jury's initial verdict sheet, on which the jurors wrote "all legal fees incurred" in the space for punitive damages, Tr. 211:22-23, which Defendants believe proves that the jury's award of punitive damages could have been based on only surmise or conjecture.  But the fact that the jury initially awarded punitive damages in the amount of Plaintiff's legal fees does not suggest that they based their award on conjecture.  It could just as well suggest a lay person's reasonable determination that an award of legal fees may be the amount necessary to deter like conduct in the future.  *Cf. Citrin v. Erikson*, 918 F. Supp. 792, 801 (S.D.N.Y. 1996) ("The Court finds that an award of attorneys' fees in the instant case will 'deter others from acting similarly in like circumstances.'" (quoting *Chambless v. Masters, Mates & Pilots Pension Plan*, 815 F.2d 869, 871 (2d Cir. 1987))); *Univ. City Studios, Inc. v. Nintendo Co.*, 615 F. Supp. 838, 863 (S.D.N.Y. 1985) ("Weighing these considerations, an appropriate punitive damages award is equal to the amount of Nintendo's legal fees incurred in defending against

Universal's infringement action. While recognizing the unusual nature of this means of determining the size of the award of exemplary damages, only such an award bears a reasonable relationship both to the harm inflicted and the flagrancy of the conduct causing the harm."). In any event, following the Court's instruction to the jurors that legal fees are not their concern and that they needed to return to deliberate on the question of punitive damages, the jury returned with an award of $20,000, and the Court sees no reason to disturb this award merely because of the jury's initial confusion over what it could award.

### 4.    *Monell* Liability

Defendants' final argument with respect to their Rule 50 motion is that Plaintiff presented no evidence from which a finding of municipal liability could be inferred. It is well-established that a municipality cannot be liable for discrimination under 42 U.S.C. §§ 1981 or 1983 unless "the challenged acts were performed pursuant to a municipal policy or custom." *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004) (citing *Jett v. Dallas Ind. Sch. Dist.*, 491 U.S. 701, 733-36 (1989) (§ 1981); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 692-94 (1978) (§ 1983)). But "[t]o show a policy, custom, or practice, the plaintiff need not identify an express rule or regulation." *Id.* Rather, the Supreme Court has long recognized that "[i]f the decision to adopt [a] particular course of action is properly made by [a] government's authorized decisionmakers, it surely represents an act of official government 'policy' as that term is commonly understood." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986). Thus, "[m]unicipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered. . . . Authority to make municipal policy may be granted directly by legislative enactment or may be delegated by an official who possesses such authority, and of course, whether an official had final policymaking authority is a question of state law." *Id.* at 481-83 (citations and footnotes omitted). Stated differently, "municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Id.* at

483-84 (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985) ("'policy' generally implies a course of action consciously chosen from among various alternatives.")).

Defendants argue that "State Education Law vests policy-making authority with the Chancellor," Defs.' Br. 14 (citing N.Y. Educ. Law § 2590-g and h (Consol. 2015)), and, therefore, Principal Cunningham cannot be considered a final decision maker for purposes of *Monell* liability. But Defendants' New York Education Law citation does not discuss per-session activities, nor do Defendants address the possibility that the Chancellor may delegate policymaking authority with respect to per-session activities. Moreover, Defendants overlook the several cases within this Circuit that have found principals to be final decision makers for purposes of *Monell* liability under certain circumstances—authority that the Court cited in its summary judgment Memorandum & Order, Dkt. No. 32 at 36, but that Defendants fail to discuss, much less distinguish, in their briefs. As explained in *Eldridge v. Rochester City School District*, "a public school principal may be a final policymaker where the harm that befell the plaintiff was under the principal's control," but "[w]here the final authority for a particular matter is not within the principal's control or is subject to review by another official or entity, the principal is not the final policymaker with respect to that matter." 968 F. Supp. 2d 546, 562 (W.D.N.Y. 2013) (citations and internal quotation marks omitted). For example, "with respect to termination of teachers' employment, principals do not have final decisional authority; their decisions are subject to appeal to the Chancellor and the DOE." *Fierro v. N.Y. City Dep't of Educ.*, 994 F. Supp. 2d 581, 589 (S.D.N.Y. 2014). But in other contexts, principals may have final decision making authority. *See, e.g., Rabideau v. Beekmantown Cent. Sch. Dist.*, 89 F. Supp. 2d 263, 268 (N.D.N.Y. 2000) (finding plaintiff stated a claim for *Monell* liability because principal, "[b]y virtue of her position, [] was directly responsible for discipline in the school"). Thus, contrary to Defendants' argument, whether a principal is a final decision maker for purposes of *Monell* liability depends on the circumstances of a given case.

On the facts here, Defendants contend that "Plaintiff did not present any evidence of any kind to even submit a triable issue to the jury as to Principal Cunningham's policy-making

17

authority." Defs.' Br. 14.  To the contrary, Plaintiff's counsel questioned Principal Cunningham on this precise point:

> Q. The superintendent in January 2010, that was an individual named Jeanette Reed?
>
> A. Yes, I believe that was her name.
>
> Q. Did Superintendent Reed participate at all in this decision with respect to the '9-'10 after-school basketball program, as best you can recall?
>
> A. I don't believe that Superintendent Jeanette Reed had anything to do with per-session activity selection.
>
> Q. Were you the final decision maker regarding per-session activity?
>
> A. Yes.

Tr. 83:15-25.  Mr. Vasquez also testified that, during his meeting with Principal Cunningham, he protested her decision and "tried to make a case for [himself]," to which "she stated that it was her decision and that would be final." Tr. 52:21-53:3.  Defense counsel failed to probe this matter on cross-examination of either witness and failed to offer any evidence to contradict Principal Cunningham's testimony that she was the final decision maker with respect to per-session activity appointments.  Thus, the only evidence in the record showed that Principal Cunningham had final say regarding per-session activity appointments and may, therefore, be considered a final decision maker for purposes of *Monell* liability. *Fierro*, 994 F. Supp. 2d at 589.

### 5.    Rule 50 Conclusion

Viewing the evidence in the light most favorable to the nonmoving party, and giving deference to all credibility determinations and reasonable inferences of the jury, the Court concludes that there is no basis under Rule 50 to set aside the jury's verdict on the grounds the Defendants advance in their briefs.

### B.    Rule 59 Legal Standard

Under Rule 59, a "court may, on motion, grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1).  "It has been said that the general grounds for a

18

new trial are that the verdict is against the weight of the evidence, that the damages are excessive, or that for other reasons the trial was not fair, and that the motion also may raise questions of law arising out of substantial errors in the admission or rejection of evidence or the giving or refusal of instructions." 11 Charles A. Wright, *et al.*, *Federal Practice and Procedure* § 2805 at 68-69 (3d ed. 2012) (footnotes omitted). "Unlike judgment as a matter of law, a new trial may be granted even if there is substantial evidence supporting the jury's verdict. Moreover, a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner. A court considering a Rule 59 motion for a new trial must bear in mind, however, that the court should only grant such a motion when the jury's verdict is egregious." *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 134 (2d Cir. 1998) (citations and internal quotation marks omitted). Defendants advance four grounds for a new trial, none of which is persuasive.

### 1.    Weight of the Evidence

First, Defendants argue that the jury's verdict is against the weight of the evidence. Specifically, Defendants contend that "[t]he record in this case establishes that the verdict is clearly based on nothing more than the conclusion of plaintiff's scant testimony, which is not credible, inconsistent with the testimony of other witnesses, and gross miscarriage of justice." Defs.' Br. 16. As support, Defendants cite *Ricciuti v. New York City Transit Authority* for the proposition that that "a trial judge should be most inclined to disturb a jury's verdict, based entirely or primarily on credibility, where one conflicting account is so inherently implausible as to tax credibility or there is independent evidence in the trial record clearly demonstrating that to believe one party's witness over the other's would lead to a miscarriage of justice." 70 F. Supp. 2d 300, 308 (S.D.N.Y. 1999). *Ricciuti* also states that "[a] trial judge should be least inclined to disturb a jury's verdict, based entirely or primarily upon witness credibility, where the conflicting accounts of the witnesses are equally plausible (or implausible), and there is no independent evidence in the trial record clearly demonstrating that, if a miscarriage of justice is to be avoided, one party's witnesses should not be believed." *Id.* Applying this standard to the

trial record, Defendants' arguments fail.  After an independent review of the evidence viewed in a neutral light, the Court concludes that this verdict was not "egregious."  Because "'the resolution of the issues depended on an assessment of the credibility of the witnesses, it is proper for the court to refrain from setting aside the verdict and granting a new trial.'" *Claudio v. Mattituck-Cutchogue Union Free Sch. Dist.*, 955 F. Supp. 2d 118, 143 (E.D.N.Y. 2013) (quoting *Metromedia Co. v. Fugazy*, 983 F.2d 350, 363 (2d Cir. 1992)).

### 2.    Compensatory Damages

Second, Defendants contend that the jury's award of $2,700 in compensatory damages is excessive.  "Compensatory damages 'are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct.'" *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003) (quoting *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 432 (2001)).  "A district court may order a new trial in whole or limited to damages, or grant remittitur by conditioning the denial of a defendant's motion for a new trial on the plaintiff accepting the reduction in damages, if the court finds that the damages awarded by the jury are excessive." *Rainone v. Potter*, 388 F. Supp. 2d 120, 121 (E.D.N.Y. 2005) (citing *Tingley Sys. v. Norse Sys.*, 49 F.3d 93, 96 (2d Cir. 1995)).  But, "[u]nder federal law, an award will not be disturbed unless it is 'so high as to shock the judicial conscience and constitute a denial of justice.'" *Id.* at 122 (*Ismail v. Cohen*, 899 F.2d 183, 186 (2d Cir. 1990).

At trial, Mr. Vasquez testified without contradiction that he received $135 per week as per-session pay for a total of roughly $1,000 in the 2008-2009 school year.  Tr. 48:21-49:3; Tr. 65:25-66:4.  Mr. Vasquez acknowledged that the program would not have run as long in the 2009-2010 school year, indicating that he would have received something less than $1,000 had he been re-appointed to the program.  Tr. 66:5-13.  Mr. Vasquez also testified about how much he loved the program, Tr. 49:4-10, and how he "felt really surprised," "devastated," and "shocked" that the program "was being taken away from" him, which he thought was unfair and which made him feel "really sad, just really depressed," Tr. 55:4-10.  Defendants did not offer any testimony or evidence to contradict Mr. Vasquez's testimony regarding economic and

20

emotional damages, nor did they cross-examine him as to his emotional damages following Principal Cunningham's decision. In light of the evidence presented, it can hardly be said that an award of $2,700 shocks the conscience. Moreover, "[i]n the employment discrimination context, there appears to be a 'spectrum' or 'continuum' of damage awards for emotional distress. The spectrum of damage awards ranges from $5,000 to more than $100,000, representing garden-variety, significant, and egregious emotional distress claims." *Id.* (citations and internal quotation marks omitted). Mr. Vasquez's award falls at the low end of this spectrum.

Defendants also suggest that Mr. Vasquez's testimony alone could not have supported an award of this amount. But "[i]n garden variety emotional distress claims, the evidence of mental suffering is generally limited to the testimony of the plaintiff, who describes his or her injury in vague or conclusory terms, without relating either the severity or consequences of the injury. Such claims typically lack extraordinary circumstances and are not supported by any medical corroboration." *Olsen v. Cnty. of Nassau*, 615 F. Supp. 2d 35, 46 (E.D.N.Y. 2009) (citations and internal quotation marks omitted). In light of the "garden-variety" nature of Mr. Vasquez's claim, his testimony alone was sufficient to support the jury's award of $2,700 in compensatory damages.

### 3. Punitive Damages

Third, Defendants contend that "there is no basis upon which to award punitive damages," and "[e]ven assuming there was, the amount is excessive because there is no evidence supporting the reckless or evil intent of the conduct." Defs.' Br. 20. "In gauging excessiveness, the court must keep in mind that the purpose of punitive damages is 'to punish the defendant and to deter him and others from similar conduct in the future.' Thus, the court's task is 'to make certain that the punitive damages are reasonable in their amount and rational in light of their purpose to punish what has occurred and to deter its repetition.'" *Kuper v. Empire Blue Cross & Blue Shield*, No. 99 Civ. 1190, 2003 U.S. Dist. LEXIS 2362, at *21-22 (S.D.N.Y. Feb. 18, 2003) (quoting *Vasbinder v. Scott*, 976 F.2d 118, 121 (2d Cir. 1992)).

Before discussing the Defendants' arguments, the Court notes at the outset an argument that they failed to make: That the punitive damage award is excessive *per se* under the Constitution because it is more than seven times the amount of compensatory damages.  To explain, the Supreme Court and Second Circuit have long held that punitive damage awards may violate the Due Process Clause of the Fourteenth Amendment if they exceed certain ratios with compensatory damage awards.  For example, last year the Second Circuit held that "[a]s a general matter, the four-to-one ratio of punitive to compensatory damages awarded is 'close to the line of constitutional propriety.'"  *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 165 (2d Cir. 2014) (citing *State Farm*, 538 U.S. at 425); *see also BMW of N. Am. v. Gore*, 517 U.S. 559, 575 (1996)).

Not only did Defendants fail to make any argument on this point in their briefs, they expressly stated in their reply brief that "plaintiff is correct that an award of punitive damages of $20,000 is not per se excessive."  Reply Br. 8.  Courts generally deem an argument waived or abandoned if a party fails to make it.  *See State St. Bank & Trust Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 172 (2d Cir. 2004) ("When a party fails adequately to present arguments in an appellant's brief, we consider those arguments abandoned." (collecting cases)); *Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 632 (S.D.N.Y. 2014) (finding arguments relating to affirmative defenses abandoned when a party failed to make them in post-trial briefs (collecting cases)); *see also U.S. Fid. & Guar. Co. v. Treadwell Corp.*, 58 F. Supp. 2d 77, 88 n.12 (S.D.N.Y. 1999) ("U.S. Fire has not raised the pollution exclusion clause argument.  Therefore, I have deemed that argument abandoned.").  In fact, the Second Circuit has deemed arguments under *Gore* and its progeny waived if a party failed to present such an argument to the district court. *See Local Union No. 38, Sheet Metal Workers' Int'l Ass'n v. Pelella*, 350 F.3d 73, 90 (2d Cir. 2003) ("Here, as Local 38 points out, punitive damages exceed nominal damages by 25,000 to 1.  Setting aside the merits, if any, of the argument, Local 38 could unquestionably have invoked *Gore* in the district court proceedings to suggest that the jury's punitive award was constitutionally excessive. . . . Local 38 failed to raise such a challenge with the court below and

22

the argument is therefore deemed waived." (citing *Anthony v. City of New York*, 339 F.3d 129, 136 n.3 (2d Cir. 2003))). Thus, because Defendants failed to argue that the punitive damage award is excessive *per se* on this basis—and instead stated that it was *not* excessive *per se*—the Court deems the argument waived and limits its discussion to arguments that Defendants actually made.

Defendants' primary argument regarding punitive damages is that there was insufficient evidence to support an award of punitive damages in the first place. As discussed in Part II.A.3. above, the Court disagrees. Defendants also argue that, assuming there was sufficient evidence to support an award of punitive damages, the amount awarded is excessive because Principal Cunningham's conduct was not sufficiently reprehensible. Although it is true that Principal Cunningham's conduct is far from the type of egregious behavior that may be found to support a significant award of punitive damages, it is equally true that the award of punitive damages in this case is relatively modest—thus reflecting what the jury may have concluded was a modest degree of reprehensibility. *Cf. Miranda-Ortiz v. Deming*, No. 94 Civ. 0476 (CSH), 2001 U.S. Dist. LEXIS 7105, at *47-48 (S.D.N.Y. June 1, 2001) ("Though recognizing that the plaintiff's injuries in our case are not the most severe and differ from those in other cases, even a cursory review of the many punitive damage awards in our Circuit involving § 1983 claims shows that the $15,000 awarded in the case at bar is considerably below the average. The Court could find no § 1983 case (nor any other case involving punitive damages for that matter) where a punitive damage award of anything approaching $15,000 was reduced as excessive." (citations omitted)).

### 4.    Plaintiff's Counsel's Closing Arguments

Finally, Defendants argue that a new trial is warranted in light of Plaintiff's counsel's closing arguments, which they contend were improper. "Obviously not all misconduct of counsel taints a verdict to such a degree as to warrant a new trial. Only when the conduct of counsel in argument causes prejudice to the opposing party and unfairly influences a jury's verdict is a new trial warranted." *In re Fosamax Prods. Liab. Litig.*, 742 F. Supp. 2d 460, 477

(S.D.N.Y. 2010) (citations and internal quotation marks omitted).  The Court concludes that the comments Defendants complain of do not rise to the level of misconduct warranting a new trial.

The first comment that Defendants take issue with is Plaintiff's counsel's statement in summation regarding the number of times Principal Cunningham answered a question with "I don't recall": "How many times did Ms. Cunningham get up there and use these magic words, 'I don't recall,' 'I lost count?'"  Tr. 167:14-15.  Defendants state that "Ms. Cunningham never testified that she 'lost count' about anything," Defs.' Br. 21, suggesting that Plaintiff's counsel intentionally misquoted the witness.  But in light of the context surrounding this statement, it is clear that the three words Plaintiff's counsel highlighted were "I don't recall," and that *he*— Plaintiff's counsel—lost count of the number of times Principal Cunningham said these words; that is, and consistent with the Court's recollection of the statement, the court reporter mistakenly placed quotation marks around "I lost count."  Defendants also argue that the number of times Principal Cunningham stated that she "did not recall" something has "nothing to do with evidence of discrimination."  Defs.' Br. 21.  But Plaintiff's counsel clearly was drawing from permissible evidence in the record to ask the jurors which of the two competing witnesses was more credible.  The Court is unaware of any authority that would make this type of statement impermissible, particularly when much stronger statements impugning witness credibility have been upheld.  *Cf. United States v. Shareef*, 190 F.3d 71, 79 (2d Cir. 1999) ("[I]t is not ordinarily improper for the prosecution to make temperate use of forms of the word 'lie' to highlight evidence directly conflicting with the defense's testimony, or 'to characterize disputed testimony' where credibility was clearly an issue, particularly where 'the prosecutor tied to the pertinent evidence of record' each instance in which the defendant supposedly 'lied.'" (quoting *United States v. Peterson*, 808 F.2d 969, 977 (2d Cir. 1987))).

"Moreover, [Defendants'] claim to have been prejudiced by the summation is undermined by the fact that [they] did not object to the statements in question during trial." *Claudio*, 955 F. Supp. 2d at 158 (citing *Okraynets v. Metro. Transp. Auth.*, 555 F. Supp. 2d 420, 430 (S.D.N.Y. 2008)).

The second comment that Defendants object to is what they characterize as Plaintiff's counsel's own personal belief regarding the evidence in the case:

> If he were to grieve this decision, Mr. Vasquez would essentially have been forced to formally accuse his principal of unlawful discrimination just months before the very same principal would be determining whether or not he was going to receive tenure. Let me ask you, if you were in that situation, would you have filed a complaint against your supervisor? If you knew that your supervisor was going to be determining your future just months later? I wouldn't.

Tr. 169:5-13. In context, Plaintiff's counsel's isolated statement of his personal view—"I wouldn't"—is, at most, of *de minimis* impropriety. *See Marcoux v. Farm Serv. and Supplies, Inc.*, 290 F. Supp. 2d 457, 468 (S.D.N.Y. 2003) ("[A]lthough plaintiff's counsel's use of language such as 'I suggest' and 'I don't believe' may have been inartful, his arguments did not rise to the level of vouching and injection of attorney credibility and personal belief . . . . [T]he personal belief statement by plaintiff's attorney in the present case tended to support obvious inferences from the evidence . . . ."). Moreover, even if this statement were improper, as with the comment above, Defendants' claim of prejudice is undermined by the fact that they did not object to the statement when it was made during summation. *Claudio*, 955 F. Supp. 2d at 158.

### 5.   Rule 59 Conclusion

Even under the less deferential Rule 59 standard, the Court cannot second-guess and set aside the jury's verdict in this case or order a new trial. As noted, the only possibly viable argument for the Defendants would have been a remittitur of the punitive damages in light of the disproportionality with the compensatory damage award. But because Defendants, who are represented by Corporation Counsel, made no argument on this basis and went so far as to concede that the award was not excessive *per se*, the Court will not, *sua sponte*, reduce the damage award on this ground.

## III.   CONCLUSION

For the reasons provided above, the Court will not disturb the jury's verdict in this case. Therefore, Defendants' motion is DENIED.

This resolves Dkt. No. 66, and the Clerk of Court is directed to enter judgment and close this case.

SO ORDERED.

Dated: __June 10__, 2015
New York, New York

_____
ALISON J. NATHAN
United States District Judge